```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| AMY K.Z. CATLETT,<br><br>          Plaintiff,<br><br>     v.<br><br>NEW JERSEY STATE POLICE,<br>et al.,<br><br>          Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>  Civil Action<br>No. 12-cv-153 (JBS/AMD)<br><br>**MEMORANDUM OPINION** |

**SIMANDLE, Chief Judge:**

In this action, Plaintiff Amy Catlett alleges that she was tortiuously and unconstitutionally detained by police and medical professionals and was administered unwanted medical treatment upon suspicion that she was suicidal. (See generally Am. Compl. [Docket Item 72].) Several defendants have already been dismissed from the case [see Docket Items 31, 52, 127], and the remaining defendants, specifically, Vineland Police Officer John Calio, South Jersey Healthcare, Dominic Diorio, M.D., and Diane Stavoli, LP, have filed three unopposed motions for summary judgment to dismiss all claims against them. [Docket Items 128, 129, 130.] They seek dismissal of constitutional search and seizure claims brought under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, as well as various state tort claims, including battery, false imprisonment, and medical

negligence. Plaintiff did not file opposition to any of the motions. For the reasons discussed below, the Court will grant the motions for summary judgment and dismiss the claims against Defendants Calio, Diorio, Stavoli, and South Jersey Healthcare. The Court finds as follows:

    1.    The factual record for purposes of the pending motions are straightforward and undisputed.[1] On November 21, 2009, Police Officer John Calio was sent to a home in Vineland, New Jersey to check on the well-being of Plaintiff Amy Catlett because the Vineland Police Department had received a report that Catlett was possibly suicidal. (Calio Statement of Material Facts )("SMF") [Docket Item 131] ¶¶ 3-4.) Plaintiff's mother, who owned the home, answered the door and Officer Calio explained that he was responding to a report that Catlett was suicidal. Plaintiff's mother consented to Calio's entry and led him upstairs to Plaintiff's bedroom. She told Calio that her daughter was depressed. (Id. ¶¶ 11, 12, 15.)

    2.    Catlett agreed to speak to Calio outside. She stated that she had nothing to live for, or that she could no longer see the purpose of life, since she lost her fiancé and her daughter was off to college. (Id. ¶¶ 19, 20.) She told Calio

---

[1] Because Plaintiff has filed no opposition, the Court deems the facts set forth by Defendants undisputed for purposes of the pending summary judgment motion. See L. CIV. R. 56.1(a).

2

that she was depressed and "probably" told him that she was taking Xanax for her depression. When asked if she wanted to harm herself, she replied, "Of course, hasn't everyone thought of doing that?" (Id. ¶¶ 18, 21, 22.) Based on these statements, Calio determined that Catlett was a potential harm to herself and called Vineland EMS to transport her to the nearest medical facility. (Id. ¶¶ 23, 26-27.)

3.  Catlett was "very agitated" and "very upset," and was "very uncooperative" about getting into the ambulance before ultimately relenting. (Diorio SMF [Docket Item 128-2] ¶¶ 9-10.) As she was getting into the ambulance, she said something to the effect of wanting to be placed in a coma for the rest of the year. (Calio SMF ¶¶ 24-25.) She was not handcuffed.

4.  According to the report of Police Practices Expert Joseph Stine, Officer Calio's actions were in good faith and within accepted police standards. (Id. ¶ 31; Report of Joseph J. Stine, Calio Ex. I [Docket Item 131-10].) Specifically, he noted that Calio's actions throughout the encounter were "in accord with generally accepted [law enforcement] practices and procedures while showing concern for a visibly depressed and possibly suicidal person." (Report of Joseph J. Stine, at 14.)

5.  Catlett was taken to South Jersey Regional Medical Center. Hospital policy required medical providers to screen each patient who enters for medical conditions. (South Jersey

Healthcare ("SJH") and Stavoli SMF [Docket Item 129], at 5-6; SJH and Stavoli Ex. G [Docket Item 129-11].) Dr. Dominic Diorio told Catlett that she needed to give blood and a urine sample so that she could be deemed medically stable, but she initially refused. (SJH and Stavoli SMF, at 10; Diorio SMF ¶¶ 16-18.) These tests were in accordance with hospital policy. (SJH and Stavoli SMF, at 5-6.)

6. Ms. Catlett was restrained twice while at the hospital. According to records, while in the Emergency Room, Catlett became "physically abusive," and was documented to be "combative/hitting" and a "danger to self/others." As a result, Catlett was placed in restraints for approximately 35 minutes. (SJH and Stavoli SMF, at 7; Diorio SMF ¶¶ 19-20.) At another point during her evaluation, Nurse Diane Stavoli attempted to perform a routine lab draw, and Catlett bit Stavoli in the arm. (SJH and Stavoli SMF, at 5; SJH and Stavoli Ex. F [Docket Item 129-10].)[2] Catlett ran out of the Emergency Room to the parking lot, ignoring orders to return, and attempted to hit and kick the security guards who brought her back inside. (SJH and Stavoli SMF, at 6-7; Diorio SMF ¶¶ 25-26.) Catlett was deemed a "risk to self and others" and was placed in restraints "for patient and staff safety." (SJH and Stavoli SMF, at 7.) The

---

[2] For this conduct, Catlett pled guilty to a charge of disorderly conduct. (SHJ and Stavoli SMF, at 6.)

4

restraints were removed once Catlett became calm and cooperative. (Diorio SMF ¶ 26.) In both instances, the appropriate orders for restraints were entered. (SJH and Stavoli SMF, at 7.)

7. Ms. Catlett ultimately consented to the drawing of blood and to a urine sample. (Diorio SMF ¶¶ 23, 28-29.)

8. After his evaluation, Dr. Diorio arranged to transfer Catlett to the Crisis Unit at the Bridgeton location of South Jersey Health System for crisis evaluation, noting the following diagnosis: "(1) Psychotic thoughts (2) suicidal ideation. Treatment/therapy recommended: Crisis evaluation to determine risk to self and others." (Diorio SMF ¶ 34; SJH and Stavoli SMF, at 7-8.)

9. According to an expert report by Dr. Michael Chansky, the use of restraints was appropriate, as was the need to perform medical screening and urine tests to ensure that a patient is medically stable. (SJH and Stavoli SMF, at 15-16; Report of Michael E. Chansky, M.D., SJH and Stavoli Ex. L [Docket Item 129-16], at 7.) SHJ was required to medically screen Catlett for conditions that might cause inappropriate behavior and, "once medically cleared, transport her to a specialty center [such as the Crisis Unit at Bridgetown] for professional psychiatric screening." (Report of Michael E. Chansky, M.D., at 6.) Dr. Chansky opined that the medical staff

5

at SJH "provided appropriate care in [Catlett's] best interest and safety," and met the expected standard of emergency care. (Id. at 7.)

10.   According to an expert report by Dr. Barbara Ziv, "[a]ll available records indicate that the individuals involved in Ms. Catlett's care acted appropriately and within standards of care." (SJH and Stavoli SMF, at 16; Report of Barbara Ziv, M.D., SJH and Stavoli Ex. M [Docket Item 129-17], at 36.)

11.   Plaintiff commenced this action in the Superior Court of New Jersey, Law Division, Cumberland County. Defendants South Jersey Healthcare and Diane Stavoli, LPN, filed a notice of removal on January 9, 2012. [Docket Item 1.][3]

12.   The New Jersey State Police, City of Vineland Police Department, and Vineland Emergency Medical Service were dismissed from the suit in earlier opinions by this Court. [Docket Items 31 & 52.] Since the filing of the Amended Complaint on February 11, 2014 [Docket Item 72], the parties have also stipulated to the dismissal of Vineland EMTs DiNunzio and Watson [Docket Item 127].

13.   Pending before the Court are motions for summary judgment filed by the remaining named defendants, Officer Calio [Docket Item 130], Dr. Diorio [Docket Item 128], and South

---

[3] The Court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1367.

Jersey Healthcare and Nurse Stavoli, who together filed a single motion [Docket Item 129]. Officer Calio seeks dismissal of the constitutional search and seizure claims under 42 U.S.C. § 1983 the New Jersey Civil Rights Act, as well as various state tort claims (Counts One through Four). Dr. Diorio, Nurse Stavoli, and South Jersey Healthcare seek dismissal of the state tort claims for medical negligence, assault and battery, and false imprisonment (Counts Five through Eight). Plaintiff has not filed any opposition to these motions.[4]

14. Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court finds that based on the undisputed facts in the record, summary judgment is warranted for the defendants.

**Officer Calio**

15. With respect to Officer Calio, the Court agrees that Plaintiff has presented no evidence to support her Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1983. First,

---

[4] Plaintiff's deadline to file oppositions to the three motions expired on May 18, 2015 and June 1, 2015. Despite filing no opposition, Plaintiff has, through counsel, actively participated in this litigation since the opposition deadline. [See Docket Item 135.]

7

Calio's warrantless entry into the Catlett residence was not unlawful because Catlett's mother, the owner of the home, expressly consented to the entry. See Georgia v. Randolph, 547 U.S. 103, 109 (2006) (Fourth Amendment generally prohibits warrantless entry into a home but prohibition does not apply where entry is made "with the voluntary consent of an individual possessing authority"); Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Additionally, because Calio was told that Catlett was possibly suicidal, exigent circumstances also existed to justify the entry. See Minnesota v. Olson, 495 U.S. 91, 100 (1990) (exigent circumstances exist to justify warrantless entry into a home where there is a risk of danger to persons inside a dwelling); Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006) ("[E]xigent circumstances exist where officers reasonably . . . believe that someone is in imminent danger.") (internal quotations and citation omitted).

16. Nor did Officer Calio violate Catlett's Fourth Amendment rights when he placed her into an ambulance and sent her to the hospital for a mental health evaluation. The Fourth Amendment also applies to warrantless seizures for purposes of involuntary commitment, and the fundamental inquiry remains the same: whether the government's conduct was objectively reasonable under the circumstances. Doby v. DeCrescenzo, 171 F.3d 858, 871 (3d Cir. 1999). When there is probable cause to

believe that a person is a danger to himself or others, an officer may reasonably seize and detain a person for a psychiatric evaluation without offending the Fourth Amendment. See Must v. West Hills Police Dep't, 126 Fed. App'x 539, 542-43 (3d Cir. 2005) ("[T]he temporary involuntary commitment of those deemed dangerous to themselves or others qualifies as a 'special need' permitting the state to act without a warrant."); see also Cole v. Town of Morristown, ___ Fed. App'x ____, 2015 WL 5559462, at *3 (3d Cir. Sept. 22, 2015) ("[I]t is not unreasonable to temporarily detain an individual who is dangerous to herself or others.").

    17. Based on the evidence, the question of whether there was probable cause to believe that Catlett posed a danger to herself is not a close one. See Monday v. Oulette, 118 F.3d 1099, 1102 (6th Cir. 1997) (noting that "a showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior."). Calio was told by the dispatcher that Catlett was "possibly suicidal," and Catlett's mother told Calio that Catlett was depressed. Calio also spoke to Catlett and observed her behavior before taking action. Catlett admitted that she was depressed and was taking medication. When asked whether she wanted to harm herself, she responded, "Of course, hasn't everyone?" Catlett also stated

9

that she no longer saw a purpose to her life after her fiancé passed away. No rationale jury could find that Calio's decision to send Catlett to the hospital for a mental health evaluation under these circumstances was unreasonable under the Fourth Amendment. See, e.g., Roberts v. Anderson, 213 Fed. App'x 420, 427 (6th Cir. 2007) (holding that summary judgment was appropriate and officers had probable cause to transport plaintiff to hospital because they were told that plaintiff was attempting to commit suicide and plaintiff stated that he was going back to his van to die).

   18.   Having established that there was no federal constitutional violation, the state constitutional claims under the New Jersey Civil Rights Act must also be dismissed. See Hedges v. Musco, 204 F.3d 109, 120 n.12 (3d Cir. 2000) (noting that, with respect to unlawful searches and seizures, the New Jersey Constitution does not provide any greater protection than its federal counterpart); Desilets v. Clearview Reg'l Bd. of Educ., 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) (stating same); see also Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (analyzing all of plaintiffs' NJCRA claims, including claims of improper search and seizure and false arrest, through the lens of § 1983 because "[t]his district has repeatedly interpreted NJCRA analogously to § 1983."); Major Tours, Inc. v. Colorel, 720 F. Supp. 2d 587, 604

(D.N.J. 2010) (Simandle, J.) (applying one analysis to equal protection claim brought under both § 1983 and the NJCRA because there was no reason to believe analysis would be different).

19. Finally, the remaining state tort claims must be dismissed because New Jersey law, specifically N.J.S.A. § 30:4-27.7(a), shields Officer Calio from suit. In the civil commitment context, N.J.S.A. § 30:4-27.7(a) grants law enforcement officers who are involved in the process of commitment immunity from civil and criminal liability so long as they "act in good faith" and "[take] reasonable steps to assess, take custody of, detain or transport [the] individual for the purposes of mental health assessment or treatment." N.J.S.A. § 30:4-27.7(a). There is no indication that Calio acted in bad faith, or that the steps he took to detain Catlett and call for a mental health evaluation were unreasonable in light of the circumstances. To the contrary, in addition to the evidence already discussed which supports the dismissal of the constitutional claims, the record includes an expert witness report by Dr. Stine which concludes that Calio's actions were "in accord with generally accepted [law enforcement] practices and procedures." Plaintiff has presented no evidence to contradict Defendant's facts. Accordingly, the Court finds that Officer Calio is entitled to immunity from suit on the state law claims. See Cole v. Town of Morristown, ___ Fed. App'x ___,

2015 WL 5559462, at *4 (3d Cir. Sept. 22, 2015) (affirming dismissal of state law claims because police officers who responded on the scene and called for a mental health screening of plaintiff were immune from suit under § 30:4-27.7(a) and there was no evidence of bad faith).

20.   The Court will grant Calio's motion for summary judgment and will dismiss Calio from the suit.

### **South Jersey Healthcare, Nurse Stavoli, and Dr. Diorio**

21.   The only claims against South Jersey Healthcare, Nurse Stavoli, and Dr. Diorio are state tort claims. (See Am. Compl. Counts Five, Six, Seven, and Eight.) Because the New Jersey statute noted above also provides immunity from civil and criminal liability to health care workers and medical providers when they act reasonably and in good faith, the claims against these Defendants must also be dismissed. See N.J.S.A. § 30:4-27.7 (providing immunity to "outpatient treatment provider or short-term care facility designated staff person or their respective employers"); Browne v. Kimball Med. Ctr., No. L-3054-02, 2005 WL 2510226, at *6 (N.J. Super. Ct. App. Div. Oct. 12, 2005).

22.   Plaintiff has presented no evidence from which the Court may infer that the Defendants' conduct was unreasonable or in bad faith. Nurse Stavoli and Dr. Diorio followed hospital procedure to screen mental health patients, and Ms. Catlett was

12

told that she needed to provide blood and urine samples in accordance with hospital policy. Appropriate orders were also followed for the placement of restraints. In both instances, Catlett was restrained only after she was regarded as a "danger to self/others." She was documented to be aggressive, "combative/hitting," and physically abusive; bit Stavoli in the arm; attempted to flee the hospital; and tried to hit and kick security officers. Further, restraints were promptly removed once Catlett became calm and cooperative. Under these circumstances, it was not unreasonable to order restraints for a short period of time "for patient and staff safety."

    23. Expert reports in the record further support this conclusion. After a review of the evidence, both Dr. Chansky and Dr. Ziv opined that SJH personnel acted appropriately in Catlett's best interest and safety, and met the expected standard of emergency care. Dr. Chansky specifically stated that the use of restraints in this case was appropriate, as was the need to perform medical screening and urine tests.

    24. Dr. Diorio is also entitled to immunity under N.J.S.A. § 30:4-27.7 for his decision to transfer Catlett to the Crisis Unit at Bridgeton for further professional psychiatric screening "to determine risk to self and others." Dr. Diorio knew that Catlett had expressed thoughts of suicide and observed her being aggressive and physically violent towards hospital staff. She

had also been restrained twice during her time at SJH. Based on this, Dr. Diorio reasonably believed Catlett to be a risk to herself and others and needed further psychiatric evaluation. In his expert report, Dr. Chansky also noted that after performing the requisite medical screening tests, SJH was required to transport Catlett to a specialty center such as the Crisis Unit at Bridgeton for professional psychiatric screening. There is simply no evidence in the present record from which a reasonable juror could conclude that Diorio's decision to transfer Catlett to Bridgetown was unreasonable or in bad faith.[5] The Court therefore finds that SJH, Stavoli, and Diorio are entitled to immunity under N.J.S.A. § § 30:4-27.7.

25. Although Defendants are immune from suit, the Court notes that the evidence is also insufficient as a matter of law to establish Defendants' liability for the torts alleged in the Amended Complaint.

26. Plaintiff cannot prevail on her claim of battery (Count Six). Battery in the medical malpractice context "'is reserved for those instances where either the patient consents

---

[5] Dr. Diorio's decision was also in accordance with N.J.S.A. § 2A:62A-16, which provides that, when a medical professional believes a patient intends to carry out an act of imminent serious violence against herself or others, the medical professional has a duty to warn and protect by arranging for voluntary or involuntary commitment to a psychiatric unit of a general hospital or outpatient treatment center. N.J.S.A. § 2A:62A-16(c)(1)-(2).

to one type of operation but the physician performs a substantially different one from that for which authorization was obtained, or where no consent is obtained.'" Starozytnyk v. Reich, 871 A.2d 733, 742 (N.J. Super. Ct. App. Div. 2005) (quoting Howard v. Univ. of Medicine and Dentistry of N.J., 800 A.2d 73, 80 (N.J. 2002)); see also Samoilov v. Raz, 536 A.2d 275, 280-81 (N.J. Super. Ct. App. Div. 1987). The undisputed record shows that while Catlett initially resisted, she ultimately consented to giving urine and blood samples for medical screening purposes. Moreover, there is nothing in the record to suggest that Defendants used her samples for anything other than screening to ensure that Catlett was medically stable.

27.  Nor can Plaintiff maintain a claim against Defendants for false imprisonment (Count Six). The "essence of the tort [of false imprisonment] consists in depriving the plaintiff of [her] liberty without lawful justification. 32 Am. Jur. 2d, False Imprisonment § 4 (1982). To support such a cause of action, the plaintiff must show that she was arrested or detained against her will, and without proper legal justification. Mesgleski v. Oraboni, 748 A.2d 1130, 1138 (N.J. Super. Ct. App. Div. 2000). The Court need not repeat its discussion of the record in this case, but suffice it to say that the evidence as a whole, even when viewed in light most favorable to Plaintiff, provides ample

15

support that Defendants were justified in holding Catlett until the required medical screening was completed, and in ordering a psychiatric evaluation at a designated mental health screening facility pursuant to N.J.S.A. §4-27.4. See Beatty v. Cahill, 2006 WL 2805450, at *3 (N.J. Super. Ct. App. Div. Oct. 3, 2006) (finding no support for false imprisonment claim where officer requested mental health screening for plaintiff who was giving non-responsive answers and had been under treatment for mental illness). A reasonable jury could not find for Plaintiff on the basis of the factual record.

28.   Catlett also cannot sustain a claim for medical malpractice (Count Five). It is well-settled that in medical negligence actions, the plaintiff must establish the requisite standard of medical care and the deviations from that standard that resulted in injury. See Rosenberg v. Tavorath, 800 A.2d 216, 225 (N.J. Super. Ct. App. Div. 2002); Toy v. Rickert, 146 A.2d 510, 513 (N.J. Super. Ct. App. Div. 1958). Moreover, with "rare exceptions," evidence of deviation from accepted medical standards must be provided through expert testimony from qualified physicians. Schueler v. Strelinger, 204 A.2d 577, 585 (N.J. 1964); see also Mottola v. City of Union City, No. 05-3964, 2007 WL 2079939, at *2 (D.N.J. July 17, 2007) ("[A] plaintiff must produce expert testimony both defining the recognized standard of care, skill and knowledge, as well as the

departure therefrom."); Estate of Chin ex rel. Chin v. St. Barnabas Med. Ctr., 734 A.2d 778, 785 (N.J. 1999) (expert testimony not required only in the "unusual medical malpractice case" where the trial is essentially no different from an ordinary negligence case) (citations omitted). Since Catlett has not carried her burden of establishing the proper standard of care or that Defendants failed to meet that standard, nor has she produced relevant expert testimony of any kind,[6] her medical malpractice claim fails. See Tavorath, 800 A.2d at 225 ("Absent competent expert proof of [the relevant standard of medical care, doctor's breach of that standard, and causal connection to plaintiff's injuries], the case is not sufficient for determination by the jury.").

29. Finally, because there is simply nothing in the record documenting SJH's training and supervision practices, nor any evidence that the SJH protocols followed by the Defendants were

---

[6] For a medical malpractice claim in New Jersey, Plaintiff is required to serve an Affidavit of Merit "within 60 days following the date of filing of the answer to the complaint by the defendant." N.J.S.A. 2A:53A-27. In the present case, there is no indication that any medical expert subscribed to the requisite Affidavit of Merit, and the medical malpractice claims are alternatively subject to dismissal on that ground. See Ryan v. Renny, 999 A.2d 427, 435 (N.J. 2010) (noting that Affidavit of Merit statute requirement "applies to all actions for damages based on professional malpractice.") It thus appears that Plaintiff's medical malpractice claims against Dr. Diorio, Nurse Stavoli and South Jersey Healthcare in Count Five were without even plausible merit under New Jersey law from the outset.

inconsistent with New Jersey or federal law, and because there are no viable tort claims against SJH's employees, Plaintiff cannot sustain her claims against SJH in Counts Seven and Eight.

30.   For the reasons stated above, the Court will grant the unopposed motions for summary judgment by Defendants Calio, Diorio, Stavoli, and South Jersey Healthcare. Calio, Diorio, Stavoli, and South Jersey Healthcare will be dismissed from the case.

31.   The only remaining defendants in this case are unnamed John Doe hospital employees (1-XX), ABC partnerships (1-X), and XYZ corporations (1-X). (See Am. Compl.) There is nothing before the Court or on the docket to suggest that Plaintiff has identified and named these individuals and entities, and it follows that there is no indication that they were ever served with the Complaint or Amended Complaint. The time for service under Fed. R. Civ. P. 4(m) has long expired,[7] and Plaintiff has neither moved to extend time for service nor demonstrated good cause for her noncompliance. See McCurdy v. Am. Bd. of Plastic Surgery, 157 F.3d 191, 196 (3d Cir. 1998). The time for completing discovery expired long ago.[8] Moreover, the Court does

---

[7] Plaintiff's Amended Complaint was filed on February 11, 2014. The 120-day period of Rule 4(m), Fed. R. Civ. P., expired June 11, 2014.
[8] Under the Amended Scheduling Order entered on October 23, 2014 [Docket Item 114], the time to complete factual discovery expired on December 5, 2014.

not have the ability to direct service on these unnamed Defendants because Plaintiff has failed to specifically identify them. Accordingly, the Court will exercise its discretion and dismiss these defendants. See, e.g., Mote v. Murtin, No. 07-1571, 2008 WL 2761896, at *5-6 (M.D. Pa. July 11, 2008) (dismissing John Doe defendants because plaintiff has made no showing of good cause for failing to effectuate service within specific time limit).

    32.  An accompanying order will be entered granting Defendants' motions in their entirety.

**December 18, 2015**           **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                           Chief U.S. District Judge